**WILLMAR POULTRY COMPANY, Respondent,**

v.

**CARUS CHEMICAL COMPANY, Appellant,**

**Hawkins Chemical, Inc., et al., Defendants.**

**No. C4-85-716.**

Court of Appeals of Minnesota.

Dec. 17, 1985.

Review Denied Feb. 14 and Feb. 19, 1986.

James L. Fetterly, Minneapolis, for respondent.

Eric J. Magnuson, Minneapolis, for appellant.

Heard, considered, and decided by HUSPENI, P.J., and FOLEY and FORSBERG, JJ.

## OPINION

HUSPENI, Judge.

Respondent Willmar Poultry Company (Willmar Poultry) brought this products liability action against appellant Carus Chemical Company (Carus), Reichhold Chemicals, Inc. (Reichhold), Hawkins Chemical, Inc. (Hawkins) and Thompson-Hayward Chemical Company (Thompson-Hayward), seeking to recover damages arising from a fire which occurred at Willmar Poultry's facility. Reichhold, Hawkins, and Thompson-Hayward settled with Willmar Poultry prior to trial. Following a lengthy trial, the jury allocated responsibility for the fire 20% to Willmar Poultry, 80% to Carus, and 0% to Reichhold. The trial court denied Carus' motion for judgment notwithstanding the verdict or, in the alternative, a new trial. Carus appeals. We affirm.

## FACTS

Willmar Poultry operates a turkey hatchery in Willmar, Minnesota. It periodically fumigates its hatchery buildings and incubators in order to disinfect them. For a number of years, Willmar Poultry fumigated its buildings and incubators by combining potassium permanganate and a 37% formaldehyde solution.

Carus is the sole manufacturer of potassium permanganate in the United States, and sells the product under the trade name "Cairox." Carus recommends that potassium permanganate be used in combination with formaldehyde for fumigating poultry hatcheries.

Reichhold manufactures a formaldehyde solution and sells its product under the trade name "Formalin." Willmar Poultry purchased the potassium permanganate involved in this case from Hawkins and it purchased the formaldehyde solution from Thompson-Hayward.

On November 17, 1978, as the final stage of a major cleaning of its facility, Willmar Poultry planned to do a large-scale fumigation. It had never done such an extensive fumigation before. Its normal procedure was to pour a measured amount of potassium permanganate into a three pound coffee can which contained a small amount of the formaldehyde solution.

The employees of Willmar Poultry did a few tests during the week prior to the fumigation to determine the size of containers they should use and a method for mixing the large quantities of chemicals. They decided to use stock tanks to fumigate the smaller rooms in the hatchery and garbage dumpsters to fumigate the larger areas of the facility. They also decided to modify their usual procedure to accommodate the larger amounts of chemicals that were required.

Ray Norling, the vice president of Willmar Poultry, testified that he decided to do an experiment prior to the fumigation in order to test two gas masks and also to determine whether any unexpected reactions would occur when he poured the formaldehyde solution on the potassium permanganate. He used a stock tank for his experiment. Within twenty to thirty sec-

onds after he poured the formaldehyde solution on the potassium permanganate, he observed a flame that was blue at the base and, above a couple of inches of blue flame, the flame was red. At times, the flame reached a height of twelve inches. The flame was as thick as a pointer. After three to four minutes, the flame subsided and Norling saw the flame go out. The flame was not unexpected because Norling had observed soot in other containers that were previously used for fumigation.

Norling then implemented a plan which he considered would control the flow of the formaldehyde solution and prevent a fast release of fumes. The employees placed approximately 180 pounds of potassium permanganate in the bottom of a dumpster and approximately 45 gallons of the formaldehyde solution in a 55-gallon drum which was set on a stand above the dumpster. Attached to the drum was a spigot and a hose. The employees planned that, when they opened the spigot, the formaldehyde solution would run from the drum into the dumpster and mix with the potassium permanganate. They considered that the spigot would allow them to control the rate at which the formaldehyde solution would pour into the potassium permanganate, and therefore, they would be able to control the rate and speed of the chemical reaction.

As a result of this setup, the chemicals were mixed at a much slower rate than was normal. Norling testified that he thought the slower the rate of mixture, the less fumes would be created, the personnel would have a longer time to leave the building without being harmed by the fumes, and any problems would be avoided. Norling expected some fire in the bottom of the dumpster, but he testified that he would "anticipate the same kind of flame that I saw in the stock tank."

All of Willmar Poultry's precautions backfired. When employees of Willmar Poultry opened the spigot on the drum, the formaldehyde solution poured on to the potassium permanganate and there was an instantaneous violent chemical reaction.

Within seconds, fire leapt to the ceiling of the hatchery and the uncontrollable fire destroyed the building. No one was injured.

Dr. Kent Voorhees, one of Willmar Poultry's experts, testified at trial that Willmar Poultry's method of mixing the potassium permanganate and the formaldehyde solution created a serious risk of fire. Voorhees conducted a number of experiments with potassium permanganate and the formaldehyde solution. Most of the experiments were videotaped and the videotape was shown to the jury. He used a number of different containers—coffee cans, barrels, stock tanks and dumpsters. Voorhees opined, based on his experiments, that the reaction of the two chemicals is unpredictable.

Voorhees described five factors that influence the chemical reaction: (1) in order to have a controlled chemical reaction, the chemicals need to be mixed completely and thoroughly; (2) the faster the chemicals are mixed together, the safer the reaction is; (3) it is safer to add the potassium permanganate to the formaldehyde solution, rather than vice versa; (4) containers with high sides tend to create a column of formaldehyde gas and thus create a higher risk of flames; (5) there is a maximum limit to the amount of chemicals that can be safely used.

Voorhees concluded that potassium permanganate and formaldehyde cannot be used safely to fumigate a large building. He further testified that the slow addition of small amounts of the formaldehyde solution to large quantities of potassium permanganate is the most hazardous way to mix the two chemicals.

Each drum of potassium permanganate had three labels on it. One label stated:
DANGER: STRONG OXIDIZER CONTACT WITH OTHER MATERIALS MAY CAUSE FIRE. KEEP FROM CONTACT WITH CLOTHING AND OTHER COMBUSTIBLE MATERIALS. REMOVE AND WASH CLOTHING PROMPTLY. STORE IN TIGHTLY CLOSED CONTAINERS. DO NOT

STORE NEAR COMBUSTIBLE MATE-RIALS.

Another label stated, among other things, that "contact with combustible material may cause fire or explosion." The third label contained a yellow flame symbol with the word "OXIDIZER" printed underneath the symbol.

Willmar Poultry's other expert witness, Dr. Kenneth Cohen, testified that the warnings on the potassium permanganate were inadequate. First, he testified that the warning labels specifically contradict the long-standing and recommended practice in the poultry industry of combining a combustible material (the formaldehyde solution) with a strong oxidizer (potassium permanganate). Second, Cohen testified that the labels did not set an upper limit on the quantities of chemicals that could be safely mixed. Cohen suggested that the labels should use stronger language to communicate to the user the possibility of an explosion and they should specifically state that additional information is required before a user can safely proceed with "any unique processes that are contrary to the instructions on the label."

Carus' expert, Charles O'Connor, testified that the labels were adequate. He testified that the labels on the potassium permanganate drums satisfied the standards of the American National Standard Institute. Further, he opined that the language of the labels is easily understood by someone with a sixth grade education. He did not believe there was any inconsistency between the language on the labels and the use of potassium permanganate for fumigation. In his opinion, the label on the potassium permanganate adequately warned users of the hazards of mixing the two chemicals together.

The jury determined that the potassium permanganate was in a defective condition which was unreasonably dangerous, because Carus failed to provide adequate warnings and/or instructions for the safe use of the product (in combination with the formaldehyde solution) as a fumigant for buildings. The jury also determined that

Carus' failure to provide adequate warnings directly caused Willmar Poultry's loss. The jury found no fault on the part of Reichhold. The trial court did not submit the issue of Hawkins' and Thompson-Hayward's negligence to the jury. The parties stipulated to damages of 1.8 million dollars.

## ISSUES

1. Was Willmar Poultry's recovery against Carus precluded on the basis that no one at Willmar Poultry read the warnings on the potassium permanganate drums?

2. Was Willmar Poultry's recovery against Carus precluded on the basis that Willmar Poultry was aware of the risks involved in fumigating its facility?

3. Did the trial court err in refusing to submit to the jury the issue of the distributors' negligence?

4. Did the trial court err in its jury instructions?

## ANALYSIS

### I.

Carus argues that no one at Willmar Poultry read the warnings or instructions contained on the potassium permanganate drums and, as a result, Carus' alleged failure to adequately warn Willmar Poultry could not as a matter of law be a direct cause of Willmar Poultry's loss.

We need not determine whether the failure of a user to read the provided warnings bars recovery based on an inadequate warning. Our review of the evidence indicates that the jury could have determined that at least Norling and Donald Lenz, two Willmar Poultry employees who were involved in the fumigation, had read the labels on the potassium permanganate drums before the fire.

### II.

Carus also argues that Willmar Poultry's awareness of the risks involved in using potassium permanganate precludes its

claim of an inadequate warning as a matter of law. We disagree.

■ A manufacturer has no duty to warn when a user or operator is aware of the dangers of a product. *Dahlbeck v. Dico Co.*, 355 N.W.2d 157, 163 (Minn.App. 1984), *pet. for rev. denied,* (Minn. Feb. 6, 1985) (quoting *Strong v. E.I. DuPont de Nemours Co.*, 667 F.2d 682, 687 (8th Cir. 1981)). *See also Independent School District No. 14 v. Ampro Corp.*, 361 N.W.2d 138, 143 (Minn.App.1985), *pet. for rev. denied,* (Minn. Mar. 29, 1985).

Willmar Poultry admitted knowing about some of the risks involved with fumigation. Based on Willmar Poultry's previous fumigations and Norling's experiment, Willmar Poultry did know that the chemical reaction between potassium permanganate and the formaldehyde solution created heat and some flames. Further, it did know that its employees should only be exposed to the chemicals for a short period of time. Finally, there is testimony that Norling and other Willmar Poultry employees were concerned about how to safely fumigate the facility.

■ Past experience with a product, however, does not necessarily alert users to all of the dangers associated with the product. *See Blasing v. P.R.L. Hardenbergh Co.*, 303 Minn. 41, 48, 226 N.W.2d 110, 115 (1975). *See Ampro Corp.*, 361 N.W.2d at 143 (plaintiff admitted knowing that the polyurethane foam-filled landing mats might burn, but it indicated no knowledge of the speed or intensity with which they burned). There is testimony which indicates that Willmar Poultry was not aware of the risks involved in slowly adding small amounts of the formaldehyde solution to large quantities of potassium permanganate. There is evidence that its prior fumigations did not make it aware of these risks. All of the prior fumigations at the hatchery were on a much smaller scale. Norling's testimony and Voorhees' expert testimony viewed together indicate that neither Norling nor any of the other employees knew about the dangers involved in fumigating large buildings.

We believe the evidence concerning Willmar Poultry's knowledge of the risks at least raised a question of fact for the jury to determine. The jury was instructed that "[t]here is no duty to warn where the product user knows the danger." The issue of Willmar Poultry's prior knowledge of the risks was appropriately left to the jury to consider. We cannot determine this issue as a matter of law.

### III.

Carus claims the trial court erred in refusing to submit to the jury the issue of Hawkins' and Thompson-Hayward's negligence. Carus argues that the trial court erroneously relied on Minn.Stat. § 544.41 (1984), which limits nonmanufacturers' liability in products liability actions. Carus further argues that there was sufficient evidence of the distributors' negligence to submit the issue to the jury.

Initially, we note that, contrary to Carus' argument, the trial court utilized section 544.41, not as a basis for its nonsubmission of Hawkins' and Thompson-Hayward's negligence to the jury, but for guidance in determining whether enough evidence of the negligence of the two distributors had been presented to raise a jury question. The trial court essentially directed a verdict in favor of the distributors when it decided to not submit the issue of their negligence to the jury.

■ In reviewing a directed verdict, we must make an independent determination of the sufficiency of the evidence to present a fact question to the jury. *Nemanic v. Gopher Heating & Sheet Metal, Inc.*, 337 N.W.2d 667, 669 (Minn.1983). The directed verdict is sustainable if it clearly would be the duty of the trial court to set aside a contrary verdict, as against the evidence or contrary to the law of the case. *Id.* at 670.

■ A negligence claim against the distributors required proof that they had knowledge of the products' condition and the risks involved in that condition. *See*

*Bilotta v. Kelley Co.*, 346 N.W.2d 616, 622 (Minn.1984). Here, there was evidence that Hawkins sold Willmar Poultry the potassium permanganate which was used in fumigating the facility and that Thompson-Hayward sold the formaldehyde solution. Both distributors did know that their chemicals were used for fumigation. The distributors' knowledge of how their products are used, however, is not enough evidence to create a fact question for a jury. No evidence was presented that the distributors knew and appreciated the risks involved or that they had knowledge of any inadequacies in the warnings.

We agree with the trial court that there is no evidence in the record that the distributors knew or reasonably should have known that the warnings provided by Carus were inadequate. Hence, the trial court did not err in refusing to submit to the jury the issue of the distributors' negligence.

## IV.

Carus contends that the trial court committed two errors in the jury instructions.

First, Carus asserts that the trial court erred in refusing to give the jury an instruction regarding Willmar Poultry's assumption of the risk. We find no error. It is within the trial court's discretion to give an assumption of the risk instruction. *Kantorowicz v. VFW Post, No. 230*, 349 N.W.2d 597, 599 (Minn.Ct.App.1984). In *Springrose v. Willmore*, 292 Minn. 23, 24–25, 192 N.W.2d 826, 827 (1971), the supreme court mandated that "assumption of risk must be apportioned under our comparative negligence statute." Here, the court gave the jury a typical comparative negligence instruction. The jury was able to consider the evidence regarding Willmar Poultry's assumption of the risks involved within the framework of that instruction. *See Kantorowicz*, 349 N.W.2d at 600. Hence, we do not find that the trial court abused its discretion in refusing to give an assumption of the risk instruction to the jury.

Carus also claims the trial court erred in instructing that Carus had a duty to test its product. The trial court instructed the jury regarding a manufacturer's knowledge of its product as follows:

In determining whether the manufacturers of the two chemicals knew or reasonably could have discovered the danger, you are instructed that they are obligated to keep informed of the scientific knowledge and discoveries in the field. A manufacturer of goods has a duty to use reasonable care to test the goods to protect those who will use them from the unreasonable risk of harm while the goods are being used for the recommended purpose.

The first part of this instruction is part of the proposed Minnesota JIG for "failure to warn" products liability cases. The second part is the proposed Minnesota JIG for negligence products liability actions involving manufacturing flaws.

Carus asserts that a manufacturer's duty to test its product is only applicable to negligence actions and that the jury instruction that it had a duty to test the potassium permanganate in conjunction with the formaldehyde solution was prejudicially erroneous.

A trial court has broad discretion in instructing a jury as long as the law of the case is fully, fairly and correctly stated. *Swanson v. LaFontaine*, 238 Minn. 460, 469, 57 N.W.2d 262, 268 (1953). The trial court explained its instruction in its post-trial memorandum on the basis that "[t]he duty to develop adequate warnings and instruction may well encompass a duty to test a product to discover defects."

We conclude that the trial court did not abuse its discretion in framing the jury instructions. First, it is well-recognized that "failure to warn" strict liability actions are based on negligence concepts. *See Bilotta v. Kelley Co., Inc.*, 346 N.W.2d at 622. Thus, an instruction which the Minnesota JIG suggests should be given in a negligence products liability action may well state the law applicable to a strict liability "failure to warn" case.

In a strict liability "failure to warn" case, a manufacturer is only required to warn of forseeable risks in its product. *Karjala v. Johns-Manville Products Corp.*, 523 F.2d 155, 159 (8th Cir. 1975). Both a manufacturer's duty to be informed of current scientific knowledge and a manufacturer's duty to exercise reasonable care and foresight to discover a danger in his product is relevant to whether a manufacturer knew or should have known of the risks in its product. *See id.* at 159 n. 6; *Borel v. Fibreboard Paper Products Corp.*, 493 F.2d 1076, 1089 (5th Cir.1973), *cert. denied*, 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974). Hence, under the particular facts of this case, where there was a great deal of evidence that Carus had not tested its potassium permanganate product for many years, we do not believe the trial court abused its discretion in instructing the jury as it did. We find that the instruction accurately stated the law applicable to the case.

## DECISION

Willmar Poultry's recovery against Carus was not precluded on either the basis that no one at Willmar Poultry read the warnings on the potassium permanganate drums or on the basis that Willmar Poultry was aware of the risks involved in using potassium permanganate. In addition, the trial court did not err in refusing to submit to the jury the issue of the distributors' negligence. Finally, the trial court did not err in its instructions to the jury.

Affirmed.