**T.H.S. NORTHSTAR ASSOCIATES, Limited Partnership, a Minnesota Limited Partnership, Plaintiff,**

v.

**W.R. GRACE & CO.–CONN., a Connecticut Corporation, Successor in Interest to Western Mineral Products Corp. and Zonolite Co., Defendant.**

Civ. No. 3–87–676.

United States District Court, D. Minnesota, Third Division.

April 1, 1994.

Floyd Earl Siefferman, Jr., Saliterman & Siefferman, Minneapolis, MN, Philip J. Goodman, Simpson & Berry, Birmingham, MI, Kenneth B. McClain, Humphrey Farrington & McClain, Independence, MO, John M. Klamann, Payne & Jones, Overland, KS, for T.H.S. Northstar Associates.

G. Marc Whitehead, Hugh V. Plunkett, John Caldwell Childs, Popham Haik Schnobrich & Kaufman, Minneapolis, MN, Harold J. Engel, Popham Haik Schnobrich & Kaufman, for W.R. Grace and Co.

Thomas Victor Seifert, Marianne Eileen Durkin, Head Seifert & Vander Weide, Minneapolis, MN, for National Gypsum Co.

## MEMORANDUM OPINION AND ORDER

RENNER, Senior District Judge.

### INTRODUCTION

The above-entitled action came on for trial before the undersigned and a jury between October 26 and December 21, 1993. On December 17, the jury returned a verdict finding that defendant W.R. Grace ("Grace") failed to use reasonable care in designing Monokote 3, an asbestos-containing material used to fireproof the Northstar Center, and breached a duty to warn T.H.S. Northstar ("Northstar") of the hazards associated with Monokote 3. The jury found that W.R. Grace did not commit fraud against Northstar. The jury awarded Northstar $6,240,-000 in compensatory damages. On December 21, following a separate proceeding, the jury awarded Northstar $13,500,000 in punitive damages.

Now before the Court are (1) W.R. Grace's motion for judgment as a matter of law, reduction of the verdict, or, alternatively, a new trial, pursuant to Federal Rules of Civil Procedure 50(b), 59 and 60; (2) Northstar's motion for judgment as a matter of law; and (3) Northstar's motion for pre-judgment interest.

### DISCUSSION

#### I. W.R. GRACE'S MOTION FOR JUDGMENT AS A MATTER OF LAW

Rule 50 of the Federal Rules of Civil Procedure governs the entry of judgment as a matter of law. A court may grant a motion for judgment as a matter of law where "a party has been fully heard with respect to an issue and there is no legally sufficient evidentiary basis for a reasonable jury to have found for that party with respect to that issue." Fed.R.Civ.P. 50(a)(1). Where the court for any reason denies a motion for judgment at the close of the evidence, the court is deemed to submit the action to the jury subject to a later determination of the legal questions raised by the motion; the party seeking judgment as a matter of law may renew the motion not later than ten (10) days after entry of judgment. Fed.R.Civ.P. 50(b).

Following a jury verdict, the court may grant judgment as a matter of law only when a reasonable jury could not have reached the result based on the evidence presented. *See Western American, Inc. v. Aetna Cas. and Sur. Co.*, 915 F.2d 1181, 1183 (8th Cir.1990); *City of Omaha Employees Betterment Ass'n v. Omaha*, 883 F.2d 650, 651 (8th Cir.1989). The standard required before a court may set aside a jury's verdict is a "rigorous" one. *Western American*, 915 F.2d at 1183. In evaluating a motion for judgment as a matter of law, the Court must:

"(1) resolve direct factual conflicts in favor of the nonmovant, (2) assume as true all facts supporting the nonmovant which the evidence tended to prove, (3) give the nonmovant the benefit of all reasonable inferences, and (4) deny the motion if the evidence so viewed would allow reasonable jurors to differ as to the conclusions that could be drawn."

*City of Omaha*, 883 F.2d at 651 (citations omitted).

#### A. Punitive Damages

On December 21, 1993 the jury returned a verdict awarding Northstar $13,-500,000 in punitive damages. W.R. Grace now moves to vacate the judgment entered on this verdict and dismiss the punitive damage claim as a matter of law based on a recent decision of the Minnesota Supreme Court, *Independent School District No. 622 v. Keene Corp.*, 511 N.W.2d 728 (Minn.1994) ("*I.S.D. 622*"), reh'g denied, (Feb. 25, 1994).

W.R. Grace previously moved to dismiss the punitive damage claim under *Eisert v. Greenberg Roofing & Sheet Metal Co.*, 314 N.W.2d 226, 228 (Minn.1992). At that time the Court distinguished *Eisert*, which held that a plaintiff could not recover punitive damages for property damage without personal injury under a strict liability theory, from the present action, which involved liability theories in addition to strict liability. Rather, the Court followed the court of ap-

peals' decision in *I.S.D. 622* which, also distinguishing *Eisert,* affirmed a punitive damages award on a property damage claim where no personal injury was alleged. 495 N.W.2d 244 (Minn.Ct.App.1993), *aff'd in part and rev'd in part,* 511 N.W.2d 728 (Minn. 1994). Accordingly, the Court submitted the punitive damages claim to the jury.

Before the Court entered judgment in this case, however, the Minnesota Supreme Court reversed the court of appeals in *I.S.D. 622,* holding that punitive damages are not available to a plaintiff who suffers only property damage, regardless of the theories of liability alleged in the case. *I.S.D. 622,* 511 N.W.2d at 732–33. The supreme court's ruling was rendered final on February 24, 1994, when the supreme court, en banc, denied the petition for rehearing.

As Minnesota law governs the claims in this case, the Court, sitting in diversity, is bound by the decisions of the Minnesota Supreme Court. Because this case involved only property damage and no personal injury, the Court must, under *I.S.D. 622,* set aside the punitive damages award in the amount of $13,500,000 and dismiss the punitive damages claim as a matter of law.

### B. Primary Assumption of Risk

■ Grace contends that it is entitled to judgment as a matter of law under the primary assumption of risk doctrine; alternatively, Grace argues that the Court erred by failing to instruct the jury on primary assumption of risk, thus warranting a new trial.

■ The primary assumption of risk doctrine relates to whether the defendant had a duty initially to protect the plaintiff from harm. *Henkel v. Holm,* 411 N.W.2d 1, 4 (Minn.Ct.App.1987). Primary assumption of risk applies "only where parties have voluntarily entered a relationship in which plaintiff assumes well-known, incidental risks. As to these risks, the defendant has no duty to protect the plaintiff and, thus, if the plaintiff's injury arises from an incidental risk, the defendant is not negligent." *Wagner v. Thomas J. Obert Enter.,* 396 N.W.2d 223, 226 (Minn.1986) (quoting *Olson v. Han-*

*sen,* 299 Minn. 39, 216 N.W.2d 124, 127 (1974)).

■ Secondary assumption of risk, which under Minnesota law has merged into contributory negligence, provides "an affirmative defense to an established breach of duty which may only be raised when the plaintiff has voluntarily chosen to encounter a known and appreciated danger created by the negligence of the defendant." *Id.* at 226 (quoting *Olson,* 216 N.W.2d at 127).

■ Although closely related to secondary assumption of risk, primary assumption of risk remains a distinct theory. As described by the Minnesota Supreme Court:

> "The mere fact that plaintiff would, in the exercise of ordinary care, have known or appreciated the danger is not sufficient. Where the facts are such that plaintiff must have had knowledge, the situation is equivalent to actual knowledge; but where it merely appears that he should or could have discovered the danger, the defense is contributory negligence and not assumption of risk."

*Beckman v. V.J.M. Enters., Inc.,* 269 N.W.2d 37, 39 (Minn.1978) (quoting *Coenen v. Buckman Building Corp.,* 278 Minn. 193, 153 N.W.2d 329, 338 (1967)). Primary assumption of risk " 'involves comprehension that a peril is to be encountered and a willingness to encounter it. It differs from contributory negligence, based on carelessness, by being an exercise of intelligent choice.' " *Id.* (citations omitted). For primary assumption of risk to apply, the plaintiff must manifest his acceptance of the risk and his consent " 'to undertake to look out for himself and relieve the defendant of the duty.' " *Andren v. White–Rodgers Co.,* 465 N.W.2d 102, 105 (Minn.Ct.App.1991) (citations omitted).

■ Primary assumption of risk applies to very few cases. *Wagner,* 396 N.W.2d at 226; *Rusciano v. State Farm Mut. Auto. Ins.,* 445 N.W.2d 271, 273 (Minn.Ct.App. 1989); *Goodwin v. Legionville S.S.P. Tr. Ctr.,* 422 N.W.2d 46, 50 (Minn.Ct.App.1988). This doctrine applies typically where the risk assumed is inherent in a particular activity itself, such as a dangerous sporting event. *See e.g., Wagner,* 396 N.W.2d 223 (involving

roller skating); *Olson v. Hansen,* 216 N.W.2d 124 (Minn.1974) (snowmobile rollover); *Springrose v. Willimore,* 192 N.W.2d 826 (Minn.1971) (injured in automobile drag race); *Henkel v. Holm,* 411 N.W.2d 1 (Minn. Ct.App.1987) (injured while fighting). Where the risk is hidden or unanticipated, primary assumption of risk will not lie. *Armstrong v. Mailand,* 284 N.W.2d 343, 352 (Minn.1979).

▆ The decision whether to instruct the jury on assumption of risk lies within the sound discretion of the trial court. *Rusciano,* 445 N.W.2d 271, 273. There is no abuse of discretion in failing to instruct on assumption of risk where the jury can "relate the evidence to a typical comparative negligence instruction." *Id.; Willmar Poultry Co. v. Carus Chem. Co.,* 378 N.W.2d 830, 836 (Minn.Ct.App.1985). The concepts of acceptance and consent dictate whether the primary assumption of risk theory is appropriate to submit to the jury. *Andren v. White–Rodgers Co.,* 465 N.W.2d 102, 105 (Minn.Ct. App.1991). Furthermore, a court may omit an instruction on primary assumption of risk where the "evidence shows the claimant assumed some risk and the other party's conduct enlarged that inherent risk." *Rusciano,* 445 N.W.2d at 273.

In the present case, the evidence showed that Northstar had at least a limited knowledge of asbestos and asbestos-related risks. Northstar knew at the time of purchase that the Northstar Center was fireproofed with asbestos-containing Monokote 3. The partners of T.H.S. Northstar had encountered asbestos-containing materials ("ACM") in other buildings and had removed ACM from at least two buildings prior to purchasing the Northstar Center. Northstar also had received advice from an attorney regarding the potential long-range problems and liabilities which could arise from the asbestos-containing fireproofing in the Northstar Center.

On the other hand, the evidence supported Northstar's contention that at the time of purchase it was not aware of any present contamination from asbestos and did not know that undisturbed fireproofing—apparently in good condition—could release hazardous levels of asbestos fibers into the air.

The evidence further showed that Northstar's past experience with asbestos involved different forms and conditions of ACM than those contained in the Northstar Center. Northstar presented substantial evidence that Grace represented to those individuals involved in the purchase of the Northstar Center that the ACM did not pose a hazard and would be simple and cost-effective to manage in place. Experts called by Northstar testified that a publication by the Safe Buildings Alliance, which the evidence showed was an alter ego of W.R. Grace, was materially misleading as to the hazards of Monokote 3 and the ease and cost of maintaining it in place. The evidence showed neither that Northstar fully comprehended and appreciated the risk, nor that Northstar manifested its acceptance and consent to voluntarily encounter that risk and relieve Grace of its duty. *See Beckman,* 296 N.W.2d at 39; *Andren,* 465 N.W.2d at 105.

Perhaps most damaging to Grace's argument, that the risks of the ACM were so well known and obvious to Northstar that Northstar primarily assumed the risk, is Grace's own evidence at trial. Grace presented an abundance of evidence, in the form of expert witnesses, learned treatises, and scientific data, showing both that Monokote 3 presents no health risk and that removal of the ACM from the Northstar Center was unnecessary. Grace asserted that Monokote 3 satisfied all EPA requirements and that the air levels in the Northstar Center were well within acceptable exposure limits. Grace produced evidence distinguishing between the various types of asbestos exposure and the corresponding hazards. For example, Grace produced expert testimony distinguishing the industrial levels of exposure from the commercial exposure involved in this case. Grace also attempted to distinguish between the sprayed-on fireproofing and the cementitious fireproofing applied in the Northstar Center. Grace presented evidence that the number of asbestos fibers released by Monokote 3, if any, were so minimal that the risk to occupants and workers was insignificant. Grace also presented evidence that the Monokote 3 was in good condition and did not require removal. Instead, Grace argued,

Northstar could have managed the ACM in place at a significantly lower cost.

The testimony of Grace representatives further revealed that Grace would sell Monokote 3 in the United States today if the only feasible means of application were not banned. Grace emphasized that only the application process, not Monokote 3, is banned under federal regulations.

In sum, Grace presented an abundance of evidence to rebut Northstar's claim that Monokote 3 posed a health hazard and that it necessitated removal from the Northstar Center. Grace introduced evidence showing that the risks of asbestos vary depending upon the condition of the ACM, the means of application and the type and level of exposure. Grace's own evidence showed that the health risks of asbestos and the cost and manner of dealing with it are not well-known and obvious but are highly controverted and dependent upon numerous factors. Grace's attempt now to argue the opposite side of the coin must fail.

██ Although the evidence did not support the theory of primary assumption of risk, the evidence did show that Northstar failed to exercise reasonable care in its purchase of the Northstar Center. The Court, therefore, properly instructed the jury on secondary assumption of risk, as incorporated in the contributory negligence instruction, Minnesota Practice, Jury Instruction Guides ("JIG") 130.

██ Even if the Court erred by failing to instruct on primary assumption of risk in the design defect instruction, the Court incorporated the primary assumption of risk theory in its instruction on duty to warn. The instruction read:

> A manufacturer *has no duty* to warn, however, if the user is or should be fully aware of all of the dangers inherent in the product, ...

Jury Instructions at 14 (emphasis added). Following this instruction, the jury found that Grace both had and breached a duty to warn. Therefore, with respect to the defective design instruction, any error regarding primary assumption of risk was harmless.

Grace's other argument, that the jury finding of contributory negligence mandates a finding of primary assumption of risk as a matter of law, is also without merit. This argument effectively merges primary and secondary assumption of risk. These doctrines, however, coexist; even following the enactment of the Comparative Fault Act in Minnesota, primary assumption of risk remains a distinct theory. *Olson*, 216 N.W.2d at 127; *Henkel*, 411 N.W.2d at 4. The Court's instruction asked the jury to determine whether Northstar failed to exercise reasonable care on its own behalf. A finding that Northstar did not exercise reasonable care does not equate to a finding that Northstar assumed the risk in the primary sense. Accordingly, the jury's allocation of forty percent negligence to Northstar does not mandate judgment as a matter of law.

## II. W.R. GRACE'S MOTION TO RE-DUCE VERDICT ON COMPENSA-TORY DAMAGES

██ Grace moves the court to reduce the compensatory damages award from $6,240,-000 to $3,744,000 to reflect the jury's finding that Northstar was forty percent negligent.

Upon receiving the jury's verdict awarding compensatory damages, the Court recognized that it had not properly instructed the jury with respect to the effect of its finding of contributory negligence on the monetary amount it was to award. The special verdict form instructed the jury, upon a finding that Grace was liable and that Northstar was also negligent, to apportion by percentage the amount of responsibility of each party for the damages suffered by Northstar. Immediately following the questions apportioning fault were questions asking the jury to state the amount of money that would "fairly and adequately" compensate Northstar for the reasonable costs it had incurred in the past and will incur in the future to restore the Northstar Center to the condition in which it would have been, had the Monokote 3 not contained asbestos. The verdict form did not ask the jury to state the amount of damages *without* reducing that amount by the percentage of Northstar's negligence. In addition to the

ambiguous special verdict form, the jury instructions stated as follows:

> Grace has raised the defense that Northstar negligently failed to exercise reasonable care on its own behalf. This defense is relevant to Northstar's design defect and failure to warn claims, but not to its fraud claim. **Therefore, if you find a design defect or a failure to warn, but do not find that Grace committed fraud, any negligence on Northstar's part will reduce its recovery. But if you find that Grace committed fraud, Northstar is entitled to recover the entire amount of its damages regardless of any negligence on its part.**

Jury Instructions at 18 (incorporating JIG 130) (emphasis added).

Because the Court did not clearly instruct the jury on whether to reduce Northstar's recovery, the amounts awarded for past and future compensatory damages necessarily were ambiguous as to whether they reflected a reduction for Northstar's negligence. Northstar subsequently brought a motion to submit to the jury a supplemental interrogatory to clarify the ambiguous jury verdict. Northstar's motion supplied figures, admitted into evidence, indicating that the jury had awarded approximately sixty percent of Northstar's damages,[1] reflecting Northstar's forty percent contributory negligence.

Because the jury was still empaneled for the punitive damages portion of the trial, the Court granted Northstar's motion and submitted the following special interrogatory to the jury:

> Are your responses to special verdict form questions 9 and 10 regarding compensatory damages intended to reflect your finding that Northstar was 40 percent negligent?

Below this question was a blank followed by the word "yes" and a blank followed by the word "no." The entire jury retired to the deliberation room; shortly, it returned with a "yes" answer to the interrogatory.

Grace moves the Court to reduce the judgment, entered by the Court on February 3, 1994, by forty percent to reflect Northstar's negligence. Grace argues that pursuant to Fed.R.Evid. 606(b) the Court impermissibly inquired into the validity of the jury verdict. Rule 606(b) provides:

> a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith ...

Rule 606(b) was adopted primarily to prevent the losing party from harassing jurors in an attempt to learn facts sufficient to set aside the verdict. *See Karl v. Burlington Northern R. Co.*, 880 F.2d 68, 74 (8th Cir.1989).

Several courts have clarified ambiguous jury verdicts without running afoul of Rule 606(b). In *Taylor v. Home Ins. Co.*, 777 F.2d 849 (4th Cir.1985), *cert. denied* 476 U.S. 1142, 106 S.Ct. 2249, 90 L.Ed.2d 695 (1986), the court resubmitted damages interrogatories to the jury in an age discrimination trial because the interrogatories failed to clearly indicate that the damages for the first demotion included damages for the second demotion. After the jury returned a verdict, the court clarified its instructions and the jury reconsidered the issue. The Fourth Circuit approved the district court's procedure, reasoning that the court had not directed the jury to find liability, but rather "sought to clarify the damages attributed to each demotion without dictating the result." *Id.* at 858. *See also Reuber v. Food Chemical News, Inc.*, 899 F.2d 271, 282 (4th Cir.1990), *vacated on other grounds*, 925 F.2d 703 (4th Cir.1991) (district court properly clarified an ambiguity in verdict form).

---

1. A summary prepared by Nancy Waterfield of Northstar's exact past and future damages was not provided to the jury during deliberations, as plaintiff neglected to offer the damages exhibit into evidence during trial. The figures returned by the jury, however, closely correspond with that exhibit and with estimates prepared by plaintiff's other expert witnesses. For example, plaintiff's expert, Mr. Gobbell, estimated Northstar's future damages at $4,800,000. Exhibit 1470. The jury awarded future damages in the amount of $2,880,000, precisely 60% of Gobbell's estimate.

In support of its argument that the Court violated Rule 606(b), Grace relies on two Eighth Circuit cases, *Chicago Rock Island and Pacific RR Co. v. Speth,* 404 F.2d 291 (8th Cir.1968) and *Gander v. FMC Corp.,* 892 F.2d 1373, 1379 (8th Cir.), *cert. denied* 498 U.S. 878, 111 S.Ct. 209, 112 L.Ed.2d 169 (1990). Both cases are distinguishable from the facts of the present case.

In *Speth,* the jury inquired during deliberations about the compensatory damages interrogatory.[2] The court orally repeated the interrogatory to the jury and then added:

> That would mean that if you had no other evidence, except the damage that this man has sustained, if any, this is the figure you will insert for that amount.
>
> Do I make myself plain? It is not related to any other percentages at all, negligence or contributory negligence or anything else.
>
> Do I make myself plain?

*Speth,* 404 F.2d at 293. After the jury returned a verdict, the court, sua sponte, asked the foreman if the figure represented the total damages or a net figure. When the foreman orally responded that the award represented a net figure, the court stated: "Then I will have to send you back and ask you to complete the form as to the total damage irrespective of deductions, contributory negligence or anything else. Will you please do that?" *Id.* at 294.

The Eighth Circuit found the court's questioning impermissible, reasoning that a jury must remain immune from any possible pressure or coercion to alter the verdict because of the court's interrogation. *Id.* at 295.

In *Gander,* the Eighth Circuit cited *Speth* with approval for the rule that a "jury's misunderstanding of testimony, misapprehension of law, errors in computation or improper methods of computation, unsound reasoning or other improper motives cannot be used to impeach a verdict." *Gander,* 892 F.2d at 1379. This rule, however, rests on the presumption that the jury was properly instructed. As stated in *Gander:*

The important inquiry is whether the jury was properly instructed that damages were to be calculated regardless of any fault assessed to plaintiff on the negligence claim.... [G]iven correct instruction on the law and no clear disregard for that instruction on the face of the verdict, a jury verdict must remain immune from questioning....

*Gander,* 892 F.2d at 1378–79. In *Gander,* the special verdict form read: "We the jury, find the total amount of plaintiff's damages *disregarding any fault on the part of plaintiff* to be ____." *Id.* at 1378 (emphasis added by *Gander* court). Additionally, the jury instructions stated: "In determining the total amount of plaintiff's damages, you must not reduce such damages by any percentage of fault you may assess to plaintiff." *Id.*

In contrast to both *Gander* and *Speth,* the instructions provided to the jury in this case failed correctly to instruct the jury how to calculate compensatory damages. Rather, the instructions suggested that the jury should reduce the award if Grace's liability rested on defective design or failure to warn but not on fraud. The supplemental interrogatory did not attempt to correct the jury's misunderstanding of the law or erroneous computation; it merely served to correct an ambiguity inherent in the Court's instructions.

Furthermore, the precautions taken by the Court ensured that the concerns behind Rule 606(b) were not implicated. The type of intrusion into the jury's deliberative processes contemplated by Rule 606(b) was not at issue in this case. The Court, unlike the *Speth* court, did not ask the foreperson to testify; rather, the entire jury considered the special interrogatory and returned a one-word written answer. The Court did not instruct the jury to increase or decrease its verdict based on the jury's answer, as did the court in *Speth.* Additionally, the jury had not been discharged and, thus, was neither re-empaneled nor interviewed, as occurred in *Karl,* 880 F.2d at 73 ("We conclude, however, that the method by which the court ascer-

---

**2.** The precise question submitted to the court was omitted from the record. *Speth,* 404 F.2d at 294.

tained the jury's 'true verdict'—receiving testimony from the jurors after they had returned a verdict and after the jury had been discharged—is prohibited by Fed.R.Evid. 606(b)").

Here, the Court neither dictated nor influenced the result by submitting the supplemental interrogatory. Because the Court properly clarified an ambiguity inherent in the Court's instructions, Grace's motion to reduce the compensatory damages award is denied.

## III. GRACE'S MOTION FOR A NEW TRIAL

### A. Evidentiary Rulings

■■■■ The decision whether to grant a new trial rests within the sound discretion of the district court and will be reversed only upon a clear showing of abuse of discretion. *O'Dell v. Hercules, Inc.,* 904 F.2d 1194, 1200 (8th Cir.1990). In a motion for a new trial, the court's primary purpose is to prevent the verdict from working an injustice. *Leichihman v. Pickwick, Int'l,* 814 F.2d 1263, 1266 (8th Cir.) (*"Pickwick II "*), *cert. denied,* 484 U.S. 855, 108 S.Ct. 161, 98 L.Ed.2d 116 (1987), *aff'g* 589 F.Supp. 831 (D.Minn.1984) (*"Pickwick I "*). To warrant a new trial based on an evidentiary ruling, the court must determine that the ruling was so prejudicial as to require a new trial which would likely produce a different result. *O'Dell,* 904 F.2d at 1200.

Grace has identified six evidentiary rulings which it claims were prejudicial and support granting a new trial: (1) admitting the Richard C. Finke memorandum; (2) excluding the Missouri custodian study; (3) excluding evidence of Northstar's interests in asbestos mines; (4) admitting evidence of Grace's post-sale knowledge; (5) admitting evidence of alleged abatement expenses from other litigation; and (6) denying Grace's offer of abatement records of Northstar to impeach their expert's alleged future abatement costs.

Each of the evidentiary issues Grace raises in its motion was briefed and/or argued extensively at trial. The Court carefully considered the arguments Grace now advances

at that time. None of the arguments Grace makes in connection with the instant motion has shown the Court's earlier rulings to be in error. Accordingly, the identified evidentiary rulings do not warrant a new trial in this matter.

### B. Jury Instructions

■■■■ A new trial may also be appropriate under Fed.R.Civ.P. 59 if the court erred in instructing the jury on the applicable law. *Aderans Co. v. Jablonski,* 787 F.Supp. 882, 885 (D.Minn.1992).

Grace contends that the Court committed the following errors in instructing the jury: (1) failing to submit an interrogatory regarding subsequent purchaser with notice/primary assumption of risk;[3] (2) instructing the jury on continuing duty to warn and submitting to the jury the issue of the existence of a duty to warn; (3) including a post-sale duty to warn in its instruction on negligent design; (4) failing to instruct the jury on "state of the art" and custom within the industry; and (5) instructing on NESHAPs regulations, providing the regulations to the jury and failing to provide to the jury the 1993 EPA "clarification" to the NESHAPs regulations. The Court will address each of the alleged errors in turn.

### 1. *Continuing Duty to Warn.*

■■■■ Grace argues that the Court erred in submitting to the jury the question of whether Grace had a continuing duty to warn because the existence of a duty presents a question of law for the Court. The Court finds Grace's contention disingenuous as *Grace* asked the Court to submit the issue of the existence of a duty to the jury. At the charging conference, Grace's counsel stated:

"[W]e filed this morning an objection to interrogatory number three, and a request for a supplemental interrogatory directly addressing the issue of the existence of a duty, ... I want to state for the record that Grace believes that there should be an interrogatory that inquires whether or not there was a duty, ... Again, we have to— the jury has to find that there was a duty."

---

**3.** The Court addressed this issue *supra* at pp. 645–649.

651

Tr. 5474–75. The Court drafted the special verdict question, which Grace now claims constitutes "fundamental error," in response to Grace's request.

If the Court erred in submitting the issue to the jury, Grace is barred from raising this argument as grounds for a new trial under the doctrine of invited error. "It is 'fundamental that where the defendant "opened the door" and "invited error" there can be no reversible error.'" *Federal Crop Ins. Corp. v. Hester*, 765 F.2d 723, 727 (8th Cir.1985) (quoting *United States v. Steele*, 610 F.2d 504, 505 (8th Cir.1979)). Having specifically requested the Court to submit the duty issue to the jury, Grace may not now complain that the Court committed error.

■■■■■ In any event, the Court did not err in submitting the issue of the existence of a duty to the jury. As a general rule, whether a party has a legal duty to warn is a question of law for the court. *Germann v. F.L. Smithe Machine Co.*, 395 N.W.2d 922, 924 (Minn.1986); *Todalen v. U.S. Chemical Co.*, 424 N.W.2d 73, 78 (Minn.Ct.App.1988). The existence of this duty, however, depends upon the awareness or knowledge of the plaintiff. A manufacturer has no initial duty to warn when a user is aware of the dangers of a product; however, "past experience with a product does not necessarily alert users to all of the dangers associated with the product." *Willmar Poultry Co. v. Carus Chemical Co.*, 378 N.W.2d 830, 835 (Minn.Ct.App. 1985), *pet. for rev. denied*, (Minn.1986). *See also Kallio v. Ford Motor Co.*, 391 N.W.2d 860, 864 (Minn.Ct.App.1986), *aff'd* 407 N.W.2d 92 (Minn.1987). When the level of a plaintiff's knowledge or awareness presents a question of fact, this question, and therefore the inseparable issue of the defendant's duty, cannot be determined as a matter of law and is appropriately submitted to the jury. *Willmar Poultry*, 378 N.W.2d at 835 ("We believe the evidence concerning Willmar Poultry's knowledge of the risks at least raised a question of fact for the jury to determine. The jury was instructed that '[t]here is no duty to warn where the product user knows the danger.'"). *See also Kallio*, 391 N.W.2d at 864. Like the court in *Willmar Poultry*, the Court found that the evidence of Northstar's knowl-edge of asbestos hazards raised a question of fact for the jury.

■■■ As to the propriety of instructing the jury on the continuing duty to warn theory, Minnesota courts clearly and un-equivocally have recognized the existence of a post-sale duty to warn. *See Hodder v. Goodyear Tire & Rubber Co.*, 426 N.W.2d 826, 833 (Minn.1988), *cert. denied* 492 U.S. 926, 109 S.Ct. 3265, 106 L.Ed.2d 610 (1989); *Kociemba v. G.D. Searle & Co.*, 707 F.Supp. 1517, 1528 (D.Minn.1989) ("Minnesota prod-ucts liability law recognizes a continuing duty to warn of dangers associated with using a product"). Based upon the evidence received during trial, the Court concluded as a matter of law that this case presented the "special case" wherein the continuing duty to warn doctrine applied. *See Ramstad v. Lear Sie-gler Div. Holdings Corp.*, 836 F.Supp. 1511, 1517 (D.Minn.1993) (enumerating the "special circumstances" of *Hodder*).

### 2. *Failure to Warn.*

The Court finds that the respective in-structions on defective design and failure to warn were clear and correctly stated the law.

### 3. *State of the Art.*

■■■ Grace claims that the Court erred in failing to instruct the jury on state of the art and custom within the industry. In support, Grace cites *Kallio v. Ford Motor Co.*, 407 N.W.2d 92, 96–97 (Minn.1987), for the follow-ing proposition: "Minnesota holds that, at a minimum, state of the art and custom of the industry should be included as factors to be considered under jury instruction patterned after JIG 117." Grace Memorandum at 32. Contrary to Grace's interpretation, *Kallio* did not mandate "at a minimum" an instruc-tion on state of the art. Rather, the court merely approved the trial court's addition of state of the art to JIG 117, as a factor to consider in determining whether a design is unreasonably dangerous.

The Minnesota JIGs do not include state of the art in the instruction on design defect. Despite the lack of this instruction, however, Minnesota JIG 117 provides the following as an optional instruction:

A product manufacturer may not avoid its obligation to design safe products by relying on other persons to make design choices that will affect the safety of the product.

This instruction would effectively counter a defendant's reliance on state of the art. Although the Court, consistent with the Minnesota JIGs, could have included this instruction *absent* any state of the art instruction, it opted to leave the propriety and impropriety of reliance on state of the art and custom of the industry to the arguments of counsel. Grace fails to show that the Court's decision constituted error or that any error was prejudicial.

### 4. *NESHAPs*

■ Grace argues that the Court erred in admitting into evidence and submitting to the jury the 1990 National Emissions Standards for Hazardous Air Pollutants regulations ("NESHAPs") without also admitting the 1993 "clarification" of the regulations.

■ The Court has broad discretion in admitting documents into evidence. *United States v. Wright,* 799 F.2d 423, 425 (8th Cir.1986). The court properly exercised that discretion in receiving into evidence the official NESHAPs regulations but not the 1993 "clarification," the legitimacy of which was highly contested. This document had been offered and received as a learned treatise only, not to be submitted to the jury during deliberations. Tr. 5696. Furthermore, the 1993 clarification arguably related to liability rather than damages, the only basis upon which the Court allowed the original NESHAPs regulations into evidence.

Also relevant to the Court's decision was the timeliness of Grace's request to submit the 1993 clarification to the jury. The Court had incorporated the essential portions of the official 1990 NESHAPs regulations into an instruction. In preparation of the instruction, the Court asked the parties to submit the relevant portions of NESHAPs to the Court. At that time—prior to charging the jury and sending them to deliberate—both parties submitted to the Court the *1990* NESHAPs regulations with no reference to the 1993 clarification. Not until well into

deliberations when the jury asked for the exhibit number of the NESHAPs regulations did Grace seek to offer the 1993 document into evidence. Based upon the untimeliness of Grace's request, in addition to the questionable validity and relevance of the 1993 document, the court properly exercised its discretion in refusing to submit it to the jury.

## IV. NORTHSTAR'S MOTION FOR JUDGMENT AS A MATTER OF LAW

■ Northstar moves for judgment as a matter of law on the grounds that the evidence introduced at trial failed to support the jury verdict apportioning forty percent fault to Northstar. Northstar therefore claims it is entitled to judgment in the full amount of its actual damages, or $10,400,000.00.

Based upon the evidence submitted at trial, the Court cannot conclude that the jury's verdict lacks an evidentiary basis. *See Western American,* 915 F.2d at 1183. Therefore, Northstar's motion for judgment as a matter of law will be denied.

## V. NORTHSTAR'S MOTION FOR PRE-JUDGMENT INTEREST

■ Northstar moves, pursuant to Minnesota Statute section 549.09, for prejudgment interest on the compensatory damages awarded by the jury on December 17, 1993. Northstar seeks interest on the full amount of the compensatory damages awarded, or $6,240,000.00. Under section 549.09 subd. 1(b)(2), however, a court may not award interest on future damages, or $2,880,-000.00 of the total compensatory award. Therefore, the amount of past damages subject to prejudgment interest is $3,360,000.00.

Grace does not dispute the dates and interest rates submitted by Northstar. Applying those dates and rates to the sum of $3,360,-000.00, therefore, Northstar is entitled to $1,403,007.12 in prejudgment interest.

Northstar is also entitled under Minn.Stat. § 550.36 to interest during the period in which the execution of the judgment was stayed. The Court ordered the stay of execution of judgment on February 11, 1994. The interest accruing between February 11

and the date of this order, April 1, based on the rate of three percent is $13,532.05. Northstar is thus entitled to pre- and post-judgment interest totaling $1,416,539.17.

### CONCLUSION

Based on the foregoing, and the records, files and proceedings herein, **IT IS HERE-BY ORDERED THAT:**

1. Grace's motion for judgment as a matter of law is **GRANTED IN PART** with respect to the punitive damages claim and **DENIED IN PART** with respect to the other claims;

2. Grace's motion for reduction of the compensatory damages award is **DENIED;**

3. Grace's motion for a new trial is **DENIED;**

4. Northstar's motion for judgment as a matter of law is **DENIED;**

5. Northstar's motion for prejudgment interest is **GRANTED;** and

6. The stay of execution of judgment be lifted, judgment on the punitive damages award in the amount of $13,500,000.00 be vacated, and judgment be entered in the amount of $6,240,000.00 in compensatory damages, $1,403,007.12 in prejudgment interest and $13,532.05 in postjudgment interest. **LET JUDGMENT BE ENTERED ACCORDINGLY.**